[Cite as *State v. Chase*, 2026-Ohio-2815.]

## COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                              :

    Plaintiff-Appellee,              :

                           No. 115417

    v.                                      :

RILEY CHASE,                               :

    Defendant-Appellant.           :

---

### JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** July 23, 2026

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-23-686081-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, Gregory Ochocki and Michael R. Wajda, Assistant Prosecuting Attorneys, and Shaurya Tapan Pandya, Certified Legal Intern, *for appellee.*

The Weatherly Law Firm, LLC, and Justin M. Weatherly, *for appellant.*

EMANUELLA D. GROVES, P.J.:

{¶ 1} In this delayed appeal, defendant-appellant Riley Chase ("Chase") challenges the trial court's imposition of consecutive sentences. Upon review, we affirm the trial court's decision.

## I.    Facts and Procedural History

{¶ 2}    In November 2023, Chase was indicted in a ten-count indictment for conduct that occurred on October 22, 2023.  Count 1 and 2 charged Riley with abduction in violation of R.C. 2905.02(A)(1) and (2), third-degree felonies.  Counts 3 and 4 charged him with strangulation in violation of R.C. 2903.18(B)(2), third-degree felonies.  Counts 5 and 6 charged Riley with strangulation in violation of R.C. 2903.18(B)(3) with furthermore clauses that the victim was a family or household member, fourth-degree felonies.  Count 7 charged him with disrupting public services in violation of R.C. 2909.04(A)(3), a fourth-degree felony.  Count 8 charged Riley with domestic violence in violation of R.C. 2919.25(A) with a furthermore clause that the offender previously pleaded guilty to or was convicted of domestic violence, a fourth-degree felony.  Count 9 charged him with obstructing official business in violation of R.C. 2921.31(A), a second-degree misdemeanor.  Count 10 charged Riley with resisting arrest in violation of R.C. 2921.33(A), a second-degree misdemeanor.  Counts 1, 2, 7, 9, and 10 included forfeiture-of-a-weapon specifications.  Counts 2, 4, and 6 also included one- and three-year firearm specifications while Count 8 included a one-year firearm specification.  Chase pleaded not guilty to the indictment.

{¶ 3}    Chase later retracted his not guilty pleas and entered into a plea agreement, which involved the deletion of the one-year firearm specification associated with Count 8 upon the State's recommendation.  Chase pleaded guilty to Counts 1 (abduction) and 5 (strangulation) as charged in the indictment and

amended Count 8 (domestic violence). Count 2, 3, 4, 6, 7, 9, and 10 were nolled. The trial court accepted Chase's guilty pleas, ordered a presentence investigation and report ("PSI report"), and scheduled sentencing hearing. The PSI report included details regarding the events that transpired on October 22, 2023, and information regarding Chase's mental health, history of substance abuse, and criminal record — which included one prior domestic-violence conviction and several operating-a-vehicle-impaired convictions, two of which placed him on "inactive community control" at the time of the October 22, 2023, offenses.

{¶ 4} Prior to the hearing, Chase filed a sentencing memorandum. Therein, Chase requested that the trial court consider community-control sanctions in lieu of imprisonment since he had "minimal criminal history," acknowledged the wrongfulness of his actions, was unlikely to commit future crimes, had a low likelihood of recidivism, was enrolled in treatment and "seeking solutions to his problems," and had strong family and community support. Several letters from Chase's supporters were attached to the memorandum.

{¶ 5} A sentencing hearing was subsequently held. First, Chase addressed the trial court and the victim, his wife. Defense counsel then spoke on Chase's behalf. The trial court challenged some of defense counsel's statements, referencing information gleaned from Chase's PSI report:

> He repeatedly threw her around, he slapped her, he choked her, he placed his hands around her neck. She kneed him to try to get away. He pushed her . . . He threw a xylophone at her, he grabbed her by her neck and her jaw, he slammed her head, he hit her head into the wall

and slapped her. She was able to get away. I mean, he just continued to beat her. He took her by her hair and threw her to the ground.

. . .

[H]e placed a gun into her hand and telling her to pull the trigger to kill him. She attempted to get away from him. He pointed the gun at her cheek. He got off [the victim] and she told him not to touch her anymore. And that's when she got up and she left the house.

{¶ 6} Next, the trial court heard from the State, the victim, and the victim's family members and friends and were shown photographs of the injuries she sustained. During her statement, the victim told the trial court that she recently learned that this was not Chase's first domestic-violence incident. She stated, "I read the information on that report and so many of the details are very similar." The victim advised the October 22, 2023 incident was not isolated, "[i]t was just the worst incident." She believed she survived "only by the grace of God," explaining:

The beating I took from my husband, the one person in the world who is supposed to be my protector, lasted nearly an hour. He strangled me to the point that I'd black out multiple times. He held a fully loaded and chambered gun to my head and to my cheek. He tried to wrap my hand around that gun and make me pull the trigger on myself. He threw my phone so I couldn't call for help. He wouldn't let me leave. He slammed my head into the wall and into the floor repeatedly while I screamed at the top of my lungs hoping someone would hear what was going on and intervene. There was a point in the attack when I thought I was paralyzed. I couldn't move. I couldn't breath[e]. All I could think in that moment was my boys and I knew they needed me to fight for my life. I knew they needed me to find that strength within myself to get out of the house. When he finally did get off of me to open the . . . safe, I mustered up every ounce of strength I had and I left and I ran for help. My initial plan was to run to the police station but when I looked behind me, he was chasing me with the same gun he was holding to my head moments prior. I started screaming for my neighbor as I ran up their driveway and started pounding on their door. [The neighbors] called for help and the police were there within

minutes. I was eventually transported by ambulance to the emergency room and I'm aware that there was a four-hour standoff and a S.W.A.T. team was called because he would not answer the door. I still have flashbacks every time I see the dents in the walls from my head. Every room is haunted with a memory of that awful night.

{¶ 7} According to the victim, Chase's anger and the October 22, 2023 incident had lasting physical, emotional, and mental impacts on both her and her family, stating: "The trauma that [Chase] inflicted upon his small family is something that my boys and I will have . . . to live with for the rest of our lives." Following the incident, the victim completed months of physical, occupational, psychological, and speech therapy. At the time of the sentencing hearing, she continued to experience a limited range of motion in her neck; concussion-related symptoms; and anxiety, panic attacks, and severe flashbacks that "still affect[ed her] daily life." The victim also "limit[ed] going out in public" since running into Chase or his family members — who "tried to intimidate" her after the incident — was an "unmanageable . . . encounter" and would "present an impossible situation." Both of her children were also in therapy "to process the trauma that they had endured due to [Chase's] rage." The victim expressed that she was "genuinely afraid" for her and her children's lives and continued to fear that Chase would "attempt to see [the goal he had that night] through." The victim advised that "[t]he only single thing that will ease any of this is that if [Chase] spend[s] a significant amount of time in . . . custody . . . receiving the mental healthcare he so desperately needs."

{¶ 8} The victim's parents, sister, and friends offered statements about the impact Chase's "physical, mental, and emotional abuse" and "outrageous behavior"

had on the victim and their children. They described Chase as "a menace to society," detailed specific interactions with Chase and observations that they had, recalled threats that Chase made, and provided insight into the "trauma" that he caused to both the victim and their close-knit family. An anonymous letter was also submitted to the trial court by one of Chase's employees. The letter was read into the record and detailed the employee's observations of Chase's behaviors at work and interactions with the victim. The employee stated that Chase's emotional and mental abuse occurred daily and "these behaviors [were] not a single time occurrence, nor did they ever show any sign of reform. If anything, [they] consistently got worse, leading to the physical attack on [the victim]."

{¶ 9} Finally, the trial court heard from Parma Heights Police Detective Brian Hansen ("Detective Hansen"), who responded to the scene when Chase refused to exit his home. Detective Hansen advised that there were "plenty of prior calls for service involving Mr. Chase" and the four-hour incident — which involved police officers and a S.W.A.T. team — was "incredibly dangerous for first responders and neighbors alike." Detective Hansen explained that the situation was especially dangerous considering the number of guns and amount ammunition in the home and a handgun in the front yard that was "easily accessible" to Chase once he exited.

{¶ 10} The trial court sentenced Chase to a 72-month prison term, consisting of 36 months on Count 1 (abduction), 18 months on Count 5 (strangulation), and 18 months on Count 8 (domestic violence) to be served consecutively. During the

sentencing hearing, the trial court made the following findings regarding its imposition of consecutive sentences:

> The Court has listened to the gravity, as well as the impact that these crimes have had on [the victim], as well as her parents and her neighbors and her friends and the Court finds that consecutive sentences in this case are necessary to protect the public from future crime. The Court finds that consecutive sentences are necessary to punish the offender. The Court finds that consecutive sentences are not disproportionate to the seriousness of the offender's conduct. The Court further finds that consecutive sentences are not disproportionate to the danger the offender poses to the public, and the Court uses that sentencing guideline, the Court looks at his prior record, which is just repeat with domestic violence — I mean, drinking offenses and driving while drunk offenses and things of that nature. And the courts have tried other remedies to help him remedy his problem and none of it worked. Therefore, the Court does find that the offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

In July 2024, the trial court issued a sentencing entry, stating:

> The court imposes prison terms consecutively finding that consecutive service of the prison term is necessary to protect the public from future crime or to punish defendant; that the consecutive sentences are not disproportionate to the seriousness of defendant's conduct and to the danger defendant poses to the public; and that, the defendant committed one or more of the multiple offenses while the defendant was awaiting trial or sentencing or was under a community control or was under post-release control for a prior offense, or at least two of the multiple offenses were committed in this case as part of one or more courses of conduct, and the harm caused by said multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of defendant's conduct, or defendant's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by defendant.

{¶ 11} Chase filed a timely notice of appeal in August 2024; however, the appeal was dismissed sua sponte after he failed to pay the filing fee or file an affidavit

of indigency. In August 2025 Chase filed another notice of appeal, along with a motion for leave to file an untimely appeal. This court denied Chase's motion and dismissed the appeal. In October 2025, Chase filed an App.R. 26(B) application to reopen, which was sua sponte converted into a delayed App.R. 26(A) application for reconsideration. We granted Chase's application for reconsideration, vacated our denial of his motion for leave and dismissal of the untimely appeal, granted a delayed appeal, and reinstated the case. Chase raises a single assignment of error for review.

**Assignment of Error**

The court improperly required that [Chase] serve sentences consecutively in violation of [R.C. 2929.14(C)(4)].

## II.  Law and Analysis

{¶ 12} In his sole assignment of error, Chase challenges the trial court's imposition of consecutive sentences.

{¶ 13} R.C. 2929.14(C)(4) establishes that trial courts may require offenders to serve prison terms consecutively when multiple prison terms are imposed for multiple offense convictions. To impose consecutive sentences, the trial court must find that (1) consecutive sentences are necessary to protect the public from future crime or to punish the offender; (2) such sentences would not be disproportionate to the seriousness of the conduct and to the danger the offender poses to the public; and (3) one of the following applies:

(a) The offender committed one or more of the multiple offenses while the offender was awaiting trial or sentencing, was under a sanction

imposed pursuant to Section 2929.16, 2929.17, or 2929.18 of the Revised Code, or was under postrelease control for a prior offense.

(b) At least two of the multiple offenses were committed as part of one or more courses of conduct, and the harm caused by two or more of the multiple offenses so committed was so great or unusual that no single prison term for any of the offenses committed as part of any of the courses of conduct adequately reflects the seriousness of the offender's conduct.

(c) The offender's history of criminal conduct demonstrates that consecutive sentences are necessary to protect the public from future crime by the offender.

R.C. 2929.14(C)(4). Moreover, R.C. 2929.14(C)(4) and Crim.R. 32(A)(4) require the trial court to make statutory findings at the sentencing hearing prior to imposing consecutive sentences: "'the [trial] court must note that it engaged in the analysis' and that it 'has considered the statutory criteria and specifie[d] which of the given bases warrants its decision.'" *State v. Bonnell*, 2014-Ohio-3177, ¶ 26, quoting *State v. Edmonson*, 86 Ohio St.3d 324, 326 (1999). The trial court must also "incorporate its findings into its sentencing entry." *Id*. at ¶ 37.

{¶ 14} On appeal, a reviewing court must be able to ascertain evidence supporting the trial court's findings from the record before it. *State v. Wells*, 2021-Ohio-2585, ¶ 71, citing *Bonnell* at ¶ 29. "A trial court is not, however, required to state its reasons to support its findings, nor is it required to [recite verbatim] the statutory language, 'provided that the necessary findings can be found in the record and are incorporated in the sentencing entry.'" *State v. Sheline*, 2019-Ohio-528, ¶ 176 (8th Dist.), quoting *Bonnell* at ¶ 37. When evaluating a trial court's imposition of consecutive sentences, an appellate court must "review the record, including

findings underlying the sentence" and may modify or vacate the sentence only "if it clearly and convincingly finds . . . that the record does not support the sentencing court's findings under . . . [R.C. 2929.14(C)(4)]" or "the sentence is otherwise contrary to law." R.C. 2953.08(G)(2).

{¶ 15} In his appellate brief, Chase acknowledges that the trial court's sentencing entry addresses R.C. 2929.14(C)(4)'s proportionality and necessity requirements and finds that they were met. However, Chase claims that the trial court did not "appropriately apply" R.C. 2929.14(C)(4)(a)-(c) since the sentencing entry included "boilerplate statutory language" and its R.C. 2929.14(C)(4)(a)-(c) findings were unsupported by the record. Chase further asserts that the trial court's imposition of consecutive sentences "ignore[d] the mitigating factors surrounding [Chase's] offense[s]."

{¶ 16} Contrary to Chase's arguments, the imposition of consecutive sentences is supported by the record before us. The PSI report detailed Chase's brutal physical attack on the victim, which lasted nearly an hour. The trial court referenced some of these details, challenging the defense's claims at the sentencing hearing. The victim also recounted the events that occurred on October 22, 2023, spoke about Chase's history of anger and abuse, and discussed the physical, emotional, and mental toll Chase's behavior took on her and their children. The victim's parents, sister, and friends also described the negative impact Chase had on the victim and their entire family. An anonymous letter submitted by one of Chase's employees further described Chase's escalating behavior. The record reveals that

Chase's conduct did not end after the victim's escape and, instead, culminated in a four-hour-long incident with police officers and a S.W.A.T. team. Detective Hansen emphasized that the situation was "incredibly dangerous for first responders and neighbors alike."

{¶ 17} After listening to the gravity of Chase's offenses and the impact they had on his family and neighbors, the trial court found that consecutive sentences were necessary to protect the public and punish Chase. The trial court also found that consecutive sentences were not disproportionate to the seriousness of his conduct or the danger he posed to the public. Moreover, the trial court specifically stated that Chase's history of criminal conduct demonstrated that consecutive sentences were necessary, especially since other remedies were previously unsuccessful. The trial court's findings during the sentencing hearing fulfill the requirements set forth by R.C. 2929.14(C)(4)(c) and were also incorporated into the sentencing entry.

{¶ 18} Based on the foregoing, we find that the trial court engaged in the proper analysis, considered the required statutory criteria, and made the necessary findings before imposing consecutive sentences. Moreover, the record clearly and convincingly supports the trial court's findings that consecutive sentences were appropriate in Chase's case. Therefore, we cannot conclude that the consecutive sentences imposed were contrary to law. Consequently, Chase's single assignment of error is overruled.

{¶ 19} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EMANUELLA D. GROVES, PRESIDING JUDGE

SEAN C. GALLAGHER, J., and
TIMOTHY W. CLARY, J., CONCUR